## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** :<br><br>**Plaintiff** :<br><br>**v.** :<br><br>**ROBERT STINSON, Jr.** :<br>**LIFE'S GOOD, INC.** :<br>**LIFE'S GOOD STABL MORTGAGE FUND, LLC** :<br>**LIFE'S GOOD HIGH YIELD MORTGAGE** :<br>   **FUND, LLC** :<br>**LIFE'S GOOD CAPITAL GROWTH FUND, LLC** :<br>**IA CAPITAL FUND, LLC, and** :<br>**KEYSTONE STATE CAPITAL CORPORATION** :<br><br>**Defendants,** :<br><br>**FIRST COMMONWEALTH SERVICE COMPANY** :<br>**SUSAN L. STINSON** :<br>**CHRISTINE A. STINSON** :<br>**MICHAEL G. STINSON** :<br>**LAURA MARABLE** :<br><br>**Relief Defendants.** : | **Civil Action No.** |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      This action involves an ongoing offering fraud and Ponzi scheme being conducted

by Robert Stinson, Jr. ("Stinson"), a convicted felon and securities fraud recidivist, through a

number of entities under his control, including Life's Good, Inc. ("Life's Good"), Keystone State

Capital Corporation ("Keystone"), and four purported hedge funds: Life's Good STABL

Mortgage Fund, LLC, Life's Good High Yield Mortgage Fund, LLC, Life's Good Capital Growth

Fund LLC, and IA Capital Fund, LLC (collectively, the "Life's Good Funds" and together with

Stinson, Life's Good, and Keystone, the "Defendants").

2.      From at least 2006 through the present, Stinson, through Life's Good and

Keystone, has raised at least $16 million from more than 140 investors, by selling purported

"units" in the Life's Good Funds to, among others, investors who hold self-directed IRAs. As part

of the fraud, Stinson misrepresents to investors that the Life's Good Funds originate and hold for

investment short-term commercial mortgage loans, generating annual returns of 10 to 16 percent

through loan-fees, interest income, and operating income from real properties acquired in

foreclosure.

3.      In reality, Stinson has been stealing money for his own personal use; transferring

money to family members and others, including relief defendants Susan L. Stinson, Christine A.

Stinson, Michael G. Stinson, Laura Marable, and First Commonwealth Service Company

(collectively, the "Relief Defendants"), as well as using new investors' funds to make

"distributions" to existing investors.

4.      This fraud is ongoing. Of the $16 million raised since 2006, at least $12.1 million

was raised between April 2009 and May 2010. In May 2010 alone, Stinson raised approximately

$2.3 million from at least 30 investors.

5.      By virtue of the conduct alleged herein, all of the Defendants directly or indirectly,

singly or in concert, have engaged, are engaging, and unless restrained and enjoined will continue

to engage in acts, practices, schemes and courses of business that constitute violations of Sections

5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a),

77e(c) and 77q(a)]; and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange

Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder. [17 C.F.R.§ 240.10b5].

## JURISDICTION AND VENUE

6.      The Commission brings this action pursuant to Section 20(b) of the Securities Act
[15 U.S.C. § 77t(b)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to enjoin such
acts, transactions, practices, and courses of business; obtain disgorgement and civil penalties; and
for other appropriate relief.

7.      This Court has jurisdiction over this action pursuant to Section 22(a) of the
Securities Act [15 U.S.C. § 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15
U.S.C. §§ 78u(d), 78u(e) and 78aa].

8.      Venue lies in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C.
§ 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the Defendants are
inhabitants of, and certain of the acts, transactions, practices and courses of business constituting
the violations alleged herein occurred within, the Eastern District of Pennsylvania.

9.      In connection with the conduct alleged in this Complaint, the Defendants directly
or indirectly, singly or in concert, made use of the means or instrumentalities of transportation or
communication in, or instrumentalities of, interstate commerce, or the mails, or the facilities of a
national securities exchange.

**THE DEFENDANTS**

10.        Defendant Stinson, age 55, is a resident of Berwyn, Pennsylvania. Stinson was previously charged by the Commission with federal securities fraud in a civil action filed in May 1990 (the "1990 Action"). The 1990 Action resulted in an October 23, 1990 judgment, permanently enjoining Stinson and his co-defendants from violating the anti-fraud provisions of the Securities Act and the Exchange Act and ordering them to pay $7,680 in disgorgement and prejudgment interest. This debt was never paid.

11.        Stinson also has a criminal history, including three convictions on federal charges of fraud and/or larceny, and two convictions on state charges of conspiracy and/or fraud. With his former wife, Relief Defendant Laura Marable ("Marable"), Stinson twice filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

12.        Defendant Life's Good is a Delaware corporation organized in September 2005. Its stated purpose is to "market health products and publishing." According to information provided on its website, www.lifesgoodabundance.com (the "Website"), and in the offering materials described below, Life's Good is the Life's Good Funds' "portfolio manager," and "fund manager," and is a private equity financial services company which, along with certain subsidiaries and affiliates, manages investments in the Life's Good Funds. According to public documents, Life's Good has offices in Chesterbrook, Pennsylvania. Stinson and Stinson's wife, Relief Defendant Susan L. Stinson, are among its officers.

13.        Defendant Keystone is a Nevada corporation with offices in Chesterbrook, Pennsylvania, purportedly engaged in "real estate investment." According to information on the Website and in the offering materials further described below, Keystone is Life's Good's "financial Consultant Company" and a "self-directed IRA facilitator for offering a large range of

retirement products through their IRA custodian." Its officers include Stinson and Stinson's wife, Relief Defendant Susan L. Stinson.

14.    Defendant Life's Good STABL Mortgage Fund, LLC ("STABL Fund") is a limited liability corporation organized on or about September 29, 2006 under the laws of Pennsylvania, with a business address in Chesterbrook, PA. Its stated purpose is "real estate," and Stinson is the only identified officer.

15.    Defendant Life's Good Capital Growth Fund, LLC ("Capital Growth Fund") is a limited liability corporation organized on or about January 28, 2008 under the laws of Pennsylvania, with a business address in Philadelphia, PA 19103. Its stated purpose is "real estate," and Stinson is the only identified officer.

16.    Defendant Life's Good High Yield Mortgage Fund, LLC ("High Yield Fund") is a limited liability corporation organized on or about January 9, 2009 under the laws of Pennsylvania, with a business address in Philadelphia, PA 19123. Its stated purpose is "real estate," and Stinson is the only identified officer.

17.    Defendant IA Capital Fund, LLC ("IA Capital Fund") is a limited liability corporation organized on or about January 28, 2008 under the laws of Pennsylvania, with a business address in Philadelphia, PA 19123. Its stated purpose is "real estate," and Stinson is the only identified officer.

18.    None of Stinson, Life's Good, Keystone, or the Life's Good Funds is registered with the Commission, the Financial Industry Regulatory Authority ("FINRA"), or Pennsylvania authorities as a broker-dealer, investment adviser, or associated with the same.

## THE RELIEF DEFENDANTS

19.     Relief Defendant First Commonwealth Service Company ("First Commonwealth") is a corporation organized on or about June 10, 1983 under the laws of Pennsylvania, with a business address of 813 N. 5th Street, Suite 106, Philadelphia, PA 19123. Public records identify Stinson's brother as president of First Commonwealth.  During an Internet presentation in November 2007, further described below, Stinson identified First Commonwealth as a "23 year old company" just purchased by Life's Good which should be "up and running" on January 1, 2008.  According to the Website and the offering materials further described below, First Commonwealth is the Life's Good affiliate that enables Life's Good to provide residential mortgages to individual consumers.  First Commonwealth received at least $440,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

20.     Relief Defendant Susan L. Stinson resides in Berwyn, Pennsylvania, and is the wife of Stinson.  She is the President and Treasurer of Life's Good, an officer of Keystone, and she is a co-signatory with Stinson on at least 6 of the 20 bank accounts discussed below.  As a joint account holder with Stinson on certain financial accounts, Susan Stinson received at least $388,450 from bank accounts holding investor funds.  On information and belief, Susan Stinson has no legitimate claim to those funds.

21.     Relief Defendant Christine A. Stinson resides in Willow Grove, Pennsylvania and, on information and belief, is related to Stinson.  Christine Stinson received at least $72,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

6

22.     Relief Defendant Michael G. Stinson is Stinson's son, and is the Vice-President of Life's Good and an officer of at least one affiliated company. He resides in Berwyn, Pennsylvania. Michael Stinson received at least $30,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

23.     Relief Defendant Laura Marable resides in or around Volcano, Hawaii, is the ex-wife of Stinson, and was a co-defendant in the 1990 Action. Ms. Marable received at least $98,000 from bank accounts holding investor funds and, on information and belief, has no legitimate claim to those funds.

## THE FRAUD

### Solicitations for Investments in the Life's Good Funds

24.     At all times relevant to the facts alleged in this Complaint, defendants Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone (collectively, the "Entity Defendants") acted by and through Stinson.

25.     Since at least 2006, the Defendants have targeted and solicited, by material misrepresentations and omissions, investors' retirement and other funds, only to misappropriate these investments for the personal benefit of Stinson, his family members and others, and to pay other investors.

26.     All of the misrepresentations and omissions set forth herein, individually and in the aggregate, are material. There is a substantial likelihood that a reasonable investor would consider the misrepresented facts and the omitted information important, and/or that disclosure of the omitted facts or accurate information would alter the "total mix" of information made available to investors.

27.    In connection with the conduct described herein, the Defendants acted knowingly and/or recklessly.  Among other things, the Defendants knew or were reckless in not knowing that they were making material misrepresentations and omitting material information at all times that they solicited investments and/or provided solicitation materials to investors or prospective investors.

28.    As set forth below, the Defendants solicit investments in the Life's Good Funds through various media, including an offering document, websites, investor newsletters, e-mails, and Internet presentations, all containing misrepresentations about, among other things, investment income, investment security, investment returns, and/or use of investor funds.  For example, with respect to the STABL Mortgage Fund, Stinson promised that "every single dollar" would be invested in real estate.  In other solicitations, the Defendants describe the Life's Good Funds as "safe", "risk free" and "protected by our safe and secure lending methods."

29.    The interests, or "units," sold to investors by the Defendants in the STABL Fund, High Yield Fund, Capital Growth Fund, and IA Capital Fund are securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C.  § 78c(a)(10)], and the fraud and other misconduct described herein was in connection with the offer and sale of securities.

30.    As set forth more fully below, in the 13 months beginning on April 1, 2009, the Defendants have used millions of dollars invested by investors in the STABL Fund, as well as the other Life's Good Funds, for purposes other than real estate investment, including to fund lavish spending involving restaurants, yachts, automobiles, baseball games and travel.  They further have been using investor funds to make payments to other investors in the Life's Good Funds, ostensibly as "investment returns."

8

## Direct Solicitation Through E-mail and an Offering Memorandum

31.    The Defendants solicit investments in the Life's Good Funds directly from investors through e-mail and an offering document which, collectively, include descriptive material regarding the Life's Good Funds, their purpose and management, their holdings, and their purported rates of return.

32.    An e-mail sent to at least one potential investor describes an annual "fixed rate of [return of] 16%" for the STABL Fund and represents that an investment in the STABL Fund will "double your money every 4.5 years." According to the e-mail, investors have the "the right to self-direct [their] 401(k) or I.R.A. at this very same fixed rate of 16%."

33.    A 46-page attachment to the e-mail dated December 31, 2008 (the "Report"), created by or at the direction of Stinson, provides further information on the purported investments in Life's Good Funds. The Report contains a signed certification by Stinson that the Report does not contain any false statements or omissions.

34.    In a "Letter to Members" included in the Report, Stinson states that an investment in Life's Good Funds will generate "a very handsome return, which can be as much as 30%."

35.    The Report also states:

a.    "Units" in the Life's Good Funds are offered for sale to investors for $2,000 to $5,000 each; more than $30 million has been raised through the end of 2008; and returns can be realized "over time and/or quarterly cash distributions and capital appreciation;"

b.    Investments in the Life's Good Funds are managed by originating and holding for investment short-term senior commercial mortgage loans, secured by real property in the United States, primarily in the Philadelphia

area, with investment returns generated through loan-fee income from the

origination and extension of loans; interest income; and operating income

from real properties acquired in foreclosure. The Life's Good Funds

originated $34,285,714 in mortgage loans during 2008, generating income

through a (generally) 19 percent rate of interest, and through origination fees;

and

c.   As of December 2008, 99 percent of the principal balance in the Life's Good

Funds' portfolio consisted of first mortgage loans or joint participation in

first mortgage loans.

36.   The Report also states that the Life's Good Funds yielded an average aggregate

2008 annual return of 13.3 percent, with the following returns on investment by fund:

a.   STABL Fund:  16 percent fixed;

b.   Capital Growth Fund:  14 percent fixed plus capital appreciation;

c.   High Yield Fund:  10 percent fixed plus one-time dividend; and

d.   IA Capital Fund:  16 percent fixed.

37.   The Report further contains a section entitled "Fund Financials, Notes, and

Certifications," which includes financial statements as of December 31, 2008, and a purported

unqualified audit opinion regarding the consolidated financial statements of the Life's Good

Funds for the period ended December 31, 2008 (the "Consolidated Financial Statements") by an

"independent registered public accounting firm," Johnson and Johnson Public Accountants, Inc.

38.   There is no record of Johnson and Johnson Public Accountants, Inc. as an

accounting firm licensed in Pennsylvania, and these "audited" statements contain numerous errors

and inconsistencies.

10

39.     Further, these financial statements do not support the claims in the Report that the Life's Good Funds generate annual rates of return as high as 16 percent.  According to the financial statements, the "members'" equity for 2008 was $31,123,203, and Life's Good Funds had earnings of $2,685.80, equating to a return of less than 1 percent.   Based on this calculation, as well as other information discernible from the Consolidated Financial Statements of the Life's Good Funds included in the Report, the Life's Good Funds are not generating a rate of return of 10 to 16 percent.

40.     As described more fully below, the Life's Goods Funds not only are generating no apparent return from operations, the promised return on investment, at times paid to investors as quarterly distributions, is funded by new investor funds and not by ongoing operations.

### *Webinar Solicitation*

41.     In November 2007, Stinson gave a presentation as part of an online investor webinar sponsored by an IRA Custodian identified herein as IRA Custodian A (the "Webinar").

42.     This presentation was publicly available on the Internet, as was an accompanying PowerPoint presentation.  It was part of IRA Custodian A's "Wednesday Webinar Series" and was entitled, "Green Investments and Community Improvement Projects:  Find out how Investors are using self-directed IRA assets to fund these investments."

43.     During the introduction to the Webinar, the moderator introduces Stinson and the Life's Good Funds as a "private real estate hedge fund projecting 16 percent returns."  Identifying the STABL Fund as Life's Good's "primary hedge fund," Stinson states that when an investor invests in Life's Good real estate mortgage funds, "each quarter, that check comes to you regardless of what's going on, every single quarter."

11

44.    Further, Stinson states that "every single dollar" invested in the STABL Fund is invested in real estate, and that the STABL Fund is responsible for "400 something homes."

45.    The accompanying PowerPoint presentation created by, or at the direction of, Stinson, includes the representation that the STABL Fund is "expected to provide a 16% annual net return, with strong quarterly cash dividends, with low downside risk, which outperform equities and long-term bonds."

### *Solicitation Through Websites and a Newsletter*

46.    The Defendants also solicit investments through affiliated websites.

47.    For example, the Website, created by, or at the direction of Stinson, describes the principal executives of Life's Good, including Stinson, as having "vast experience in this highly specialized segment of the real estate industry," and as providing "oversight and management of the daily operations of the company… the team has a proven track record in generating high returns and profits on behalf of its extensive list of private investors."

48.    The Website further describes Life's Good as a "Private Equity Financial Service Company," providing "short-term financing for distressed properties, through the management of three primary funds: two private real estate hedge funds and one real estate capital investment fund." The description continues: "Client returns are generated through loan-fee income and interest income, gained through the sale of investment properties, in addition to investment income received through foreclosure property sales."

49.    Public records reveal no significant real property holdings in the name(s) of Stinson or the Entity Defendants that would support the representation that returns are generated through the sale of property through foreclosure or otherwise. As set forth below, the Defendants' bank accounts similarly do not support this representation.

12

50.    Linked to the Website is a 27-page investor newsletter created by, or at the direction of, Stinson, for the third quarter, 2009 (the "Newsletter"). According to the Newsletter, Life's Good Funds "have done extremely well over the last three years," are "protected by our safe and secure lending methods," and that they "should outperform the market and our benchmarks in the foreseeable future."

51.    The Newsletter further states that Keystone, "through its STABL and High Yield Mortgage Funds . . . offers investors the opportunity to earn higher than average consistent rates of returns while maintaining safety of their principal along the way," and that Life's Good proves itself "by continuing to generate reliable absolute returns. We want every one of our investors to know we are safe, risk-free, and deliver higher yields than most. . . .We ensure consistent performance with minimal risk."

52.    Solicitation also occurs through the Keystone Website, www.Keystonestatecapital.com, a link to which is provided in the Newsletter. Visitors to that website are required to register and log-in with a username and password to receive additional information about investing in the Life's Good Funds.

### E-mails to Industry Professionals

53.    The Defendants also target industry professionals in solicitation efforts. For example, in 2008, Stinson sent an e-mail to an Atlanta, Georgia-based investment adviser (the "Georgia e-mail"). In the Georgia e-mail, Stinson states that the Life's Good Funds offer annual rates of return ranging from 14 to 16 percent. Stinson attached to the Georgia e-mail brochures describing the STABL Fund and the Capital Growth Fund, which promise the same purported rates of return.

## The Defendants Are Misrepresenting Both the Source of Life's Good Funds' Income and the Use of Investor Funds.

54.    Defendants have misrepresented, and continue to misrepresent, both the source of the Life Good Funds' income, including the purported generation of 10 to 16 percent returns, as well as the use of investor proceeds.

### *Investors Are the Predominant Source of Bank Account Income*

55.    Contrary to the representations of the Defendants in the solicitations referenced above, the Life's Good Funds are not generating any significant income through loan-fees, interest, or operations of properties acquired in foreclosure. Rather, the "income" generated by the Defendants' activity is almost entirely comprised of investor funds.

56.    Since 2006, Defendants have raised $16 million from at least 140 investors in the Life's Good Funds, with approximately 73% invested in the STABL Fund.

57.    The Defendants used at least 20 separate bank accounts, all controlled by Stinson to receive, move, and ultimately distribute investor funds (the "Bank Accounts"). As of April 1, 2009, the Bank Accounts held an aggregate amount of just under $36,000.

58.    During the ensuing 13 months, from April 1, 2009 through May 31, 2010, the Defendants raised at least $12.1 million from investors with approximately $9.2 million originating from retirement accounts maintained through IRA Custodians. This level of investment from IRA accounts is consistent with the Defendants' efforts to target self-directed IRA holders.

59.    Overall, during this 13-month period, at least 92 percent of all new money deposited into the Bank Accounts came from investors.

60.    The Defendants did not segregate investor funds. Rather, during this period the Defendants commingled investor funds and moved investor funds between and among all the Bank Accounts.

### *Misuse and Misappropriation of Funds for Expenses and Personal Benefit*

61.    Also during the 13-month period beginning April 1, 2009, the Defendants distributed at least $9,223,083 from the Bank Accounts.

62.    Notwithstanding Stinson's representation in the Webinar that "every single dollar" of the STABL Fund is invested in real estate, a significant portion of the funds expended from the Bank Accounts, including funds from Bank Accounts in the name of the STABL Fund, has been used to pay periodic "distributions" to investors, to pay Stinson personally, to pay Stinson's friends and family, and to pay other costs and expenses.

63.    During the 13-month period, Stinson received $411,250 in payments directly and also through accounts that he holds jointly with Susan L. Stinson; Relief Defendant Marable received approximately $100,000; Relief Defendant Christine A. Stinson received at least $72,000; and Relief Defendant Michael G. Stinson received at least $30,000. In addition, Relief Defendant First Commonwealth, apparently run by Stinson's brother and identified as the mortgage unit of Life's Good, received approximately $440,000 despite generating no apparent income for the Defendants.

64.    In addition to the payments to Stinson and the Relief Defendants, the Defendants used investor funds during the 13 month period to pay for expenses such as dining, travel, and entertainment. These payments included approximately $1.5 million in purported payroll expenses, notwithstanding the lack of any apparent operational business, and over $900,000 in debit card charges. By way of examples:

15

a.    On March 4, 2010, a debit card statement from one of the Bank Accounts reflects charges at two separate steak houses: $793.10 at Fogo De Chao and 759.33 at Del Frisco's; and $471.93 spent at the Men's Wearhouse;

b.    Between April 2009 and May 2010 alone, debit card statements from the Bank Accounts reflect almost $11,000 spent at Citizen's Bank (Baseball) Park, with each trip averaging about $500. During the same time period, the statements reflect more than $51,000 on hotels primarily in Florida, including one bill for $7,844 at the Breakers Hotel in Palm Beach; and

c.    On January 28 2010, $21,810 was paid to Neptune Yachting from one of the Bank Accounts, which according to its website, rents luxury yachts. Moreover, on May 10, 2010, Stinson issued a check from one of the Bank Accounts for $68,000 to Mercedes Benz of Fort Washington, PA, presumably to purchase a car.

### *Misuse of Proceeds -- Ponzi Payments*

65.    Defendants also used new investor money to fund distributions to Life's Good Funds' investors.

66.    During the 13- month period beginning on April 1, 2009, the Defendants paid at least $915,000 from the Bank Accounts to investors in the Life's Good Funds through checks signed by Stinson or wire transfers. Several of the checks signed by Stinson to investors contain the notation "quarterly distribution."

67.    By way of further illustration of the misappropriation and misuse of investor funds:

16

a.  On June 26, 2009, an investor ("Investor B") wired $195,025 into the STABL Fund bank account. At the time, there was $112.38 in this STABL Fund bank account, and no deposits were made in the account through the end of June. Beginning on June 29, 2009, over $110,000 was distributed, either directly or through a Bank Account in the name of Life's Good, to investors, including Investor B. Indeed, Investor B's June 26, 2009 investment funded a Life's Good check to Investor B dated June 29, 2009 for $2,542, with the notation "2nd QTR. DISTR."

b.  Also on June 29, 2009, $2,000 was transferred from the STABL Fund bank account to a personal bank account in the name of Stinson and his wife, Susan Stinson, and $1,000 was transferred by wire to an account in the name of Christine Stinson.

c.  On June 30, 2009, an additional $34,000 was transferred from the STABL Fund bank account to a Life's Good bank account linked to a debit card ("Debit Card Account") routinely used to pay expenses unrelated to loan or rehabilitation activities. During the next two days, the debit card was used to pay an $85.60 cell phone bill, $137.20 to the car sharing service Zipcar, and over $50 for pizza. Moreover, $21,000 was transferred from the Debit Card Account to another Bank Account in the name of Life's Good, which issued a wire transfer on July 2, 2009 for $2,000, directed to a personal bank account in Stinson's name. In total, by the day following Investor B's investment of approximately $195,000 in the STABL Fund, which

constituted almost the entire balance of the STABL Fund bank account,

approximately $173,000 was disseminated in the manner outlined above.

### *Misrepresentations Regarding the Consolidated Financial Statements and Failure to Disclose Criminal and Regulatory History*

68.     The Defendants have misrepresented that the Consolidated Financial Statements were audited by an independent, registered, accounting firm.

69.     The Defendants have failed to disclose Stinson's multiple criminal convictions, the 1990 Action, and/or his bankruptcy filings.  Without such disclosures, the Defendants' solicitations, and in particular, their descriptions of senior management were, and are, materially misleading.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by all Defendants

70.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 69, inclusive, as if the same were fully set forth herein.

71.     From at least 2006 through the present, as a result of the conduct alleged herein, Defendants Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone, knowingly or recklessly, in connection with the offer, purchase, or sale of securities, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

18

(b)    obtained money or property by means of, or made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

72.    By engaging in the foregoing conduct, Defendants Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone have violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act by all Defendants

73.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 72, above, as if the same were fully set forth herein.

74.    There was no registration statement in effect for the offer or sale of units in the STABL Fund, High Yield Fund, Capital Growth Fund, and/or the IA Capital Fund, and no exemption from registration applies to the offer or sales of those units.

75.    Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone, by engaging in the conduct described above, directly or indirectly, singly or in concert, in connection with a security for which no registration statement was in effect, and in the absence of any applicable exemption from registration:

(a)    made use of a means or instrument of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)    carried or caused to be carried through the mails or in interstate commerce, by any means or instrument of transportation, such security for the purpose of sale and/or for delivery after sale; and/or

(c)    made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy such security through the use or medium of a prospectus or otherwise.

76.    By reason of the foregoing, Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## THIRD CLAIM FOR RELIEF

### Relief Defendants

77.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 76, inclusive, as if the same were fully set forth herein.

78.    Relief Defendants Susan L. Stinson, Christine A. Stinson, Michael G. Stinson, Laura Marable, and First Commonwealth each received proceeds of the fraud described herein, over which they each have no legitimate claim.

79.    By reason of the foregoing, Relief Defendants Susan L. Stinson, Christine A. Stinson, Michael G. Stinson, Laura Marable, and First Commonwealth have been unjustly enriched and must be compelled to disgorge the amount of their unjust enrichment.

**WHEREFORE,** the Commission respectfully requests that this Court enter a final judgment:

I.

Permanently restraining and enjoining Defendants Stinson, Life's Good, STABL Fund, High Yield Fund, Capital Growth Fund, IA Capital Fund, and Keystone from violating Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b5], thereunder;

## II.

Ordering all Defendants and Relief Defendants to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

## III.

Ordering all Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

## IV.

Granting such other and further relief as the Court may deem just and appropriate; and

## V.

Retaining jurisdiction of this action for purposes of enforcing any Final Judgment(s) and Order(s).

Dated:  June 29, 2010                          Respectfully submitted,


    s/Catherine E. Pappas
Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos (PA #67215)
Catherine E. Pappas (PA #56544)
Brendan P. McGlynn (PA #77271)
Kelly L. Gibson (PA #91753)


Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740
pappasc@sec.gov